IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JENNIFER QUELLOS ) <br> 3832 Warrendale Road ) <br> South Euclid, Ohio 44118 ) <br> ) <br> ) <br>             Plaintiff, ) <br> ) <br>             v. ) <br> ) <br> JENNINGS CENTER FOR OLDER ) <br> ADULTS ) <br> c/o Statutory Agent, ) <br> Allison Salopeck ) <br> 10204 Granger Road ) <br> Garfield Heights, Ohio 44125 ) <br> ) <br>     -and- ) <br> ) <br> ) <br> ALLISON SALOPECK ) <br> 7717 Lucretia Court ) <br> Mentor, Ohio 44060 ) <br> ) <br>     -and- ) <br> ) <br> RACHELE ROSA ) <br> 15741 Holland Road ) <br> Brookpark, Ohio, 44142 ) <br> ) <br>     -and- ) <br> ) <br> DENISE SMUDLA ) <br> 1260 Firwood Road, ) <br> Broadview Heights, Ohio 44147 ) <br> ) <br> ) <br>            Defendants. ) | CASE NO. <br><br> JUDGE: <br><br> **COMPLAINT FOR DAMAGES** <br><br> **(Jury Demand Endorsed Hereon)** |

The Employee's Attorney.™



Plaintiff Jennifer Quellos, by and through undersigned counsel, as her Complaint against Defendants, states and avers the following:

**PARTIES**

1. Quellos is a resident of the city of South Euclid, County of Cuyahoga, state of Ohio.

2. Jennings Center for Older Adults ("Jennings") is an Ohio non-profit corporation with its principal place of business located in the city of Garfield Heights, County of Cuyahoga, State of Ohio.

3. Jennings is "named enterprise" under the Fair Labor Standards Act, ("FLSA") in that it is an institution "primarily engaged in the care of the sick, the aged, or the mentally ill" within the meaning of Section 3(s)(1)(B) of the act.

4. Jennings was, at all times hereinafter mentioned, an employer under the Family Medical Leave Act ("FMLA"), 29 C.F.R § 825.104.

5. Jennings was, at all times hereinafter mentioned, an employer within the meaning of O.R.C. § 4112.02 and O.R.C. § 4111.03(D)(2).

6. During all times material to this Complaint, Salopeck was the President and CEO of Jennings, whom exercised significant control over Jennings's operations, policies, and procedures, to include, but not limited to its day to day operations and pay practices.

7. At all times relevant herein, Salopeck supervised and/or controlled Quellos' employment with Jennings, and acted directly or indirectly in the interest of Jennings in relation to its employees.

8. During all times material to this Complaint, Rosa was the Chief Healthcare Administrator of Jennings, whom exercised significant control over Jennings's operations, policies, and procedures, to include, but not limited to its day to day operations and pay practices.

The Employee's Attorney.™

9. At all times relevant herein, Rosa supervised and/or controlled Quellos' employment with Jennings, and acted directly or indirectly in the interest of Jennings in relation to its employees.

10. During all times material to this Complaint, Smudla was the Director of Human Resources for Jennings, whom exercised significant control over Jennings's operations, policies, and procedures, to include, but not limited to its day to day operations and pay practices.

11. At all times relevant herein, Smudla supervised and/or controlled Quellos' employment with Jennings, and acted directly or indirectly in the interest of Jennings in relation to its employees.

12. During all times material to this Complaint, Salopeck, Rosa, and Smudla were "employers" within the meaning of Section 3(d) of the FLSA, 29 U.S.C.§ 203(d), O.R.C § 4112.01(A)(3), O.R.C § 4111.03(D)(2) and 29 U.S.C. § 2611(4)(A)(i)-(iii) of the Family Medical Leave Act, ("FMLA"), 29 U.S.C. §§ 2611, *et seq*.

## JURISDICTION AND VENUE

13. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Quellos is alleging federal law claims arising under the FLSA, 29 U.S.C. § 207, *et seq* and the FMLA, 29 U.S.C § 2601, *et seq*. Thus, this Court has original jurisdiction over the federal law claims asserted in this Complaint under 28 U.S.C. § 1331. Additionally, this Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

14. Venue is properly placed in the United States District Court for the Northern District of Ohio, Eastern Division, because it is the district court for the district, division, and county within which the Defendants operate and conduct business, and within which a substantial part of the events or omissions giving rise to the claim occurred.



## FACTS

15. Quellos is a former employee of Jennings.

16. Quellos was hired by Jennings as a Social Worker on or around March 3, 2014.

17. At all times material to the Complaint, Quellos was paid hourly.

18. On or about April 8, 2016, Quellos received a raise to $22.73 per hour.

19. A true and accurate copy of the notification Quellos' received of her hourly rate increase is attached hereto as Exhibit "A."

20. If Quellos missed time from work due to illness, Defendants would deduct that time from Quellos' pay.

21. Quellos' primary job duties did not involve the exercise of discretion with respect to matters of significance regarding Jenning's business.

22. Quellos's job duties were primarily clerical, were not predominately intellectual in character, and did not require advanced knowledge.

23. During all times material to this Complaint, Quellos was a non-exempt employee under the FLSA.

24. Quellos routinely worked a fixed schedule from 9:00 a.m. to 5:00 p.m., five days a week ("Scheduled Hours").

25. Because Quellos' generally worked the same Scheduled Hours, she usually was paid the same amount each pay period; Defendants told Quellos this meant she was "salaried."

26. Defendants told Quellos she was "salaried" so Quellos would not question why she did not receive overtime when she worked beyond her Scheduled Hours.

27. Defendants told Quellos she was "salaried" as part of a deliberate scheme to avoid paying overtime when Quellos worked beyond her Scheduled Hours.



28. Quellos routinely worked beyond her scheduled hours.

29. In addition to her Scheduled Hours, Quellos was also required by Defendants to attend residential holiday parties and open house parties outside of her Scheduled Hours.

30. Residential holiday parties and open house parties were held for the residents of Jennings and for the primary benefit of Jennings.

31. When Quellos worked at residential holiday parties and open house parties, she worked additional hours to her Scheduled Hours, resulting in Quellos' working more than 40 hours during that particular week.

32. Defendants knew or should have known that Quellos worked in excess of 40 hours per week when she worked at residential holiday parties and open house parties.

33. Defendants failed to pay Quellos overtime at a rate of one and one-half Quellos' regular rate of pay for any hours Quellos worked in excess of 40 per week.

34. Beginning in or around May of 2017, Jennings required Quellos to perform work related to patient referrals and patient admissions, one weekend per month ("On-Call Weekend Work").

35. While performing On-Call Weekend Work, Quellos would be required to work from 9:00am to 5:00pm on Saturday and Sunday.

36. Quellos and other employees were given a laptop computer with specialized software installed to enable them to perform the On-Call Weekend Work.

37. Quellos was provided with a "referral on call to do list," which detailed the extensive nature of the work she would have to perform while receiving referral calls while she was on-call.

38. A true and accurate copy of the "referral on call to do list" Quellos was provided with is attached hereto as Exhibit "B."



39. It took Quellos an average of one to two hours to complete all of the tasks listed in the "referral on call to do list," *per call*.

40. Quellos received four to five referral calls on average each day she worked on-call.

41. Quellos was also given a document titled "skilled rehab new admission procedures" which described all of the steps she need to take when receiving new admissions during the weekend.

42. A true and accurate copy of the "skilled rehab new admission procedures" document Quellos was provided with is attached hereto as Exhibit "C."

43. It took Quellos an average of forty-five minutes to complete a new admission while she was on-call.

44. Quellos took an average of two to three new admission calls per day she was on-call.

45. While Quellos was on call, she could not use her time effectively for herself.

46. Quellos had to have access to the internet to be able to perform her on-call duties, limiting her ability to leave her home.

47. Quellos had to use the laptop she had been provided to perform her on-call duties, limiting her ability to travel.

48. At all times that Quellos was on-call, she was engaged by Jennings to wait.

49. As a result of the On-Call Weekend Work, Quellos worked over 40 hours during several weeks in 2017.

50. Quellos was not paid overtime for any of the time she performed On-Call Weekend Work.

51. Defendants attempted to avoid their overtime obligations by providing Quellos with four hours of "comp-time" the week following her on-call weekend.



52. Because the "comp-time" Quellos was offered was for far less time than the time Quellos had actually worked during the weekend while on-call, Quellos was still owed overtime for performing the On-Call Weekend Work.

53. To the extent Quellos' "comp-time" was taken during a different workweek that the workweek in which Quellos performed the On-Call Weekend Work, Quellos was still owed overtime for performing the On-Call Weekend Work.

54. At all times referenced herein, Defendants were aware of their obligations under the FLSA and the Ohio Wage Act.

55. At all times referenced herein, Defendants were aware of their obligations under the FLSA and Ohio Wage Act to compensate their employees at a rate of one-and-one-half of the regular rate of pay for all time worked in excess of 40 hours per workweek.

56. Despite their knowledge of their obligations under the FLSA and the Ohio Wage Act, Defendants never compensated Quellos at a rate of one-and-one-half of her regular rate of pay for any time she worked in excess of 40 hours per workweek.

57. Defendants first notified Quellos and her co-workers of the new On-Call Weekend Work requirement in or around March of 2017.

58. Subsequent to being notified of the new On-Call Weekend Work requirement, Quellos complained to Defendants about being required to work on weekends without being paid overtime.

59. In or around April of 2017, Quellos submitted a written complaint detailing her concerns about being required to perform On-Call Weekend Work without pay to Defendants ("Written FLSA Complaint").



60. In her Written FLSA Complaint, Quellos specifically complained that "anything over 40 hours constitutes time & half according to my friend who is an attorney."

61. A true and accurate copy of Quellos' Written FLSA Complaint is attached hereto as Exhibit "D."

62. Specifically, from April through November of 2017, Quellos complained to Tammy Arastaris, Quellos' director supervisor, Amar Shah, the Manager of Admissions, Smudla, and Salopeck at least seven times.

63. Quellos also sent Smudla emails complaining about having to work overtime and work on the weekends.

64. Salopeck responded to Quellos' complaints about overtime by telling her that because Quellos was "salaried" Salopeck could require Quellos to work as many hours as she wanted.

65. Despite Quellos' many complaints, Defendants continued to require Quellos to work on weekends without being paid overtime.

66. During all times material to this Complaint, Quellos suffered severe Chronic Asthma.

67. As a result of Quellos' Asthma, she is considered disabled within the meaning of R.C.§4112.01 (A)(13) and/or the Americans With Disabilities Act ("ADA"), 42 U.S.C § 12101 et seq.

68. Quellos made Defendants aware of her Chronic Asthma.

69. Quellos' specifically referenced her disability in her "staff member comments" in her 2015 Annual Performance review.

70. As a result of Quellos' notifications to Defendant regarding her disability, Defendants knew Quellos was disabled and/or had a physical impairment.

71. In or around April 2017, Quellos applied to take FMLA leave.



72. Quellos' FMLA request was approved.

73. Quellos continued to use her FMLA leave intermittently until November of 2017.

74. In or around October 2016, Quellos put up an article from the Cleveland Plain Dealer in her office which addressed the imbalance of power between employees and employers ("Article").

75. A true and accurate copy of the Article is attached hereto as Exhibit "E."

76. On or around December 5, 2017, Rosa stopped by Quellos' office and saw the Article.

77. Rosa made a comment that "that article is offensive, I think I am a good boss and I keep my word."

78. Quellos responded to Rosa by telling her the article was not about her or Jennings.

79. Quellos thought that Rosa was joking when she said she was offended by the Article.

80. Rosa did not make any further comments about the Article and continued to speak with Quellos about patient-related matters before leaving Quellos' office.

81. On December 12, 2017, Salopeck went into Quellos' office while she was away and ripped the Article off Quellos' wall.

82. After Salopeck notified Quellos that she took the Article down, Quellos went to see Arastaris to ask why the situation was handled in this manner.

83. Specifically, Quellos asked Arastaris why Salopeck felt the need to remove the article herself instead of someone just asking Quellos to do so.

84. Arastaris stated that she was told by Rosa to talk to Quellos about removing the article but she did not get a chance to do so.

85. At no time did Arastaris speak with Quellos about the Article.


The Employee's Attorney.™

86. Prior to Salopeck's removing the Article from Quellos' office, Quellos had never been told by anyone to take the Article down.

87. Per Rosa's request, Quellos met with Rosa and Smudla at 4:30pm on December 13, 2017 ("Meeting").

88. During the Meeting, Rosa told Quellos that she had been insubordinate when she had failed to remove the Article from the wall in her office.

89. Quellos countered Rosa's claim that she had been insubordinate by pointing out that she had never been told to take the Article down.

90. Quellos told Rosa that if she had in fact been told to take down the Article, she would have done so without question.

91. When confronted with the fact that she had not actually asked Quellos to take the article down, Rosa changed her rationale and stated that because she told Quellos she was offended, "and that is never a comfortable situation," Quellos should have just known to take the Article down.

92. Rosa then stated "I am still standing by my decision…I am still standing by the fact that I was really offended, and I find that to be completely offensive.."

93. Rosa did not state that she was "standing by [her] decision" because Quellos had allegedly refused to follow an order to remove the article.

94. Rosa then provided Quellos with a "Corrective Action Form," which stated that Quellos was being terminated for "Group 3 #27 -Excessive tardiness or absence from work."

95. Quellos had not been excessively absent or tardy from work.

96. Quellos had only missed work for reasons connected to her FMLA leave.



97. The fact that Defendants referenced Quellos' attendance on her termination notice evidences that Defendants were considering Quellos' FMLA related absences when they made the decision to terminate her employment.

98. Quellos left remarks on her termination notice that it had never been communicated to her to take the Article down.

99. A true and accurate copy of "Corrective Action Form" provided to Quellos on December 13, 2017 is attached hereto as "Exhibit F."

100. Subsequent to being terminated, Quellos was escorted by Smudla to her office to gather her belongings.

101. As Quellos was packing her belongings, Smudla remarked "well, no more weekends" in an obvious reference to Quellos' many complaints about working on weekends and not being paid overtime.

102. Rosa participated in the decision to terminate Quellos.

103. Smudla participated in the decision to terminate Quellos.

104. Salopeck participated in the decision to terminate Quellos.

105. Defendants knew that Quellos had not been insubordinate when they terminated her employment.

106. Defendants lacked a reasonable belief that Quellos had been insubordinate when they terminated her employment.

107. In reality, Quellos was terminated because she had asserted her right to overtime pay under the FLSA and the Ohio Wage Act.

108. In reality, Quellos was terminated because she exercised her rights under the FMLA.

The Employee's Attorney.™ 

109. In reality, Quellos was terminated because of her disability and/or because Defendants regarded her as disabled.

## COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT

110. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

111. During all times material to this complaint, Quellos was not exempt from receiving minimum wage under the FLSA because, *inter alia*, she was not an "executive," "computer," "administrative," "inside sales," "outside sales," or "professional" employee, as defined under the FLSA. *See* 29 C.F.R. §§ 541.0, *et seq*.

112. Quellos was non-exempt by the virtue of the fact that she was paid hourly.

113. During all times material to this Complaint, Defendants violated the FLSA by failing to compensate Quellos at a rate of time-and-one-half of her regular rate of pay for all time she worked in excess of 40 hours per workweek prescribed by 29 U.S.C. § 207.

114. During all times material to this complaint, Defendant willfully and/or recklessly violated 29 U.S.C. § 207.

115. In violating the FLSA, Defendants acted without a good faith basis, unreasonably, and in reckless disregard of clearly applicable FLSA provisions.

116. As a direct and proximate cause of Defendant's conduct, pursuant to 29 U.S.C. § 216(b), Defendant is liable to Quellos for the full amount of her overtime pay, and an additional equal amount as liquidated damages as well as costs and reasonable attorney fees.

## COUNT II: VIOLATION OF THE OHIO WAGE ACT

117. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

The Employee's Attorney.™

118. The Ohio Wage Act requires that covered employer pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of 40 hours in one workweek. O.R.C. §§ 4111.03, *et seq*.

119. During all times material to this complaint, Jennings was a covered employer required to comply with the Ohio Wage Act's mandates.

120. During all times material to this complaint, Quellos was a covered employee entitled to individual protection of Ohio Wage Act.

121. Defendant violated the Ohio Wage Act with respect to Quellos by, *inter alia*, failing to pay Quellos at a rate of time-and-one-half of her regular rate of pay for all time she worked in excess of 40 hours per workweek.

### COUNT III: RETALIATION IN VIOLATION OF THE FLSA

122. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

123. The FLSA prohibits retaliation by employers against employees for asserting their rights under the FLSA. Specifically, the FLSA provides that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . ." 29 U.S.C. § 215(a)(3).

124. Throughout Quellos' employment, she made complaints to Defendants asserting her rights under the FLSA.

125. Following Quellos' complaints, Defendants retaliated against Quellos by terminating her employment.

126. Quellos' complaints were a proximate cause of Defendants' retaliation.

127. Defendants' act constituted retaliation in violation of 29 U.S.C. § 215(a)(3).



The Employee's Attorney.™

128. As a direct and proximate cause of Defendants' retaliatory conduct, Quellos suffered and will continue to suffer damages.

### COUNT IV: RETALIATION IN VIOLATION OF THE OHIO WAGE ACT

129. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

130. The Ohio Wage Act protects employees from retaliation by employers for asserting rights that are protected by law. O.R.C. § 4111.13 (B).

131. Throughout Quellos' employment, she made complaints to Defendants asserting her rights under the Ohio Wage Act.

132. Following Quellos' complaints, Defendants retaliated against Quellos by terminating her.

133. Quellos' complaints were a proximate cause of Defendants' retaliation.

134. Defendants' act constituted retaliation in violation of O.R.C. § 4111.13 (B).

135. As a direct and proximate cause of Defendants' retaliatory conduct, Quellos suffered and will continue to suffer damages.

### COUNT V: RETALIATORY DISCHARGE IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

136. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

137. Jennings is and was a covered employer under the FMLA.

138. At all times material to the Complaint, Quellos was an "eligible employee" of Defendants within the meaning of 29 U.S.C. § 2611 of the FMLA. 29 U.S.C. § 2611(2).

139. Quellos suffered from serious health conditions for which she was entitled to FMLA leave.

140. Subsequent to exercising her rights under the FMLA, Quellos was terminated.



The Employee's Attorney.™

141. Defendants willfully retaliated and discriminated against Quellos in violation of 29 U.S.C. § 2615(a) which prohibits any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise its employee's FMLA rights.

142. As a direct and proximate cause of Defendants' conduct, Quellos suffered and will continue to suffer damages.

143. As a direct and proximate cause of Defendants' conduct, Quellos is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorney's fees.

### COUNT VI: DISABILITY DISCRIMINATION IN VIOLATION OF O.R.C. §§ 4112.02, 4112.99, *ET SEQ.*

144. Quellos restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

145. As a result of Quellos' conditions, Quellos is and was considered disabled within the meaning of O.R.C. § 4112.01(A)(13).

146. Quellos' conditions constituted a physical impairment.

147. Quellos' conditions substantially impaired one or more of her major life activities including working.

148. Defendants regarded Quellos as being disabled.

149. In the alternative, Defendants perceived Quellos' illness to substantially impair one or more of her major life activities including working.

150. Despite this actual or perceived disabling condition, Quellos was still able to perform the essential functions of the job.

151. Defendants terminated Quellos as a result of her disabling conditions.



152. Defendants' stated reason for terminating Quellos was a pretext for discrimination based on Quellos' disability and/or because Defendants regarded Quellos as disabled.

153. Defendants violated O.R.C. §4112.01 *et seq.* by discriminating against Quellos based on her disabling condition and/or perceived disability.

154. As a direct and proximate cause of the Defendants' conduct, Quellos suffered and will continue to suffer damages.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Jennifer Quellos requests judgment against Defendants and for an Order:

(a) Issue a permanent injunction:

   (i) Requiring Jennings to abolish discrimination and retaliation;

   (ii) Requiring allocation of significant funding and trained staff to implement all changes within two years;

   (iii) Requiring removal or demotion of all supervisors who have engaged in discrimination or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   (iv) Creating a process for the prompt investigation of discrimination or retaliation complaints; and

   (v) Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;



(b) Awarding against Defendants compensatory and monetary damages to compensate Quellos for unpaid wages or overtime, along with an equal amount of liquidated damages as allowed by FLSA;

(c) An award against each Defendant of compensatory and monetary damages to compensate Quellos for physical injury, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(d) An award of liquidated and punitive damages against each Defendant in an amount in excess of $25,000;

(e) Awarding Quellos costs and disbursements and reasonable allowances for fees of counsel and experts, and reimbursement of expenses;

(f) An injunction prohibiting Defendants from engaging in future violations of the FLSA, or the Ohio Wage Act;

(g) Awarding Quellos any such other and further relief as the Court deems just and proper; and

(h) For a judgment against Defendants for all damage, relief, or any other recovery whatsoever.

Respectfully submitted,

*/s/ Chris P. Wido*
Chris P. Wido (0090441)
Siqin "Carol" Wang (0097181)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Road, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: chris.wido@spitzlawfirm.com
          carol.wang@spitzlawfirm.com

*Attorneys for Plaintiff Jennifer Quellos*



## JURY DEMAND

Plaintiff Jennifer Quellos demands a trial by jury by the maximum number of jurors permitted.

>*/s/ Chris P. Wido*
>Chris P. Wido (0090441)
>**THE SPITZ LAW FIRM, LLC**

The Employee's Attorney.™

